IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

Scott Alan Miller,                          )
                                            )    Civil Action No. 6:13-165-JMC-KFM
                          Plaintiff,        )
                                            )    **REPORT OF MAGISTRATE JUDGE**
             vs.                            )
                                            )
Carolyn W. Colvin,                          )
Commissioner of Social Security,[1]         )
                                            )
                          Defendant.        )
_____)

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[2]

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for disability insurance benefits under Title II of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for disability insurance benefits ("DIB") on October 15, 2007, alleging that he became unable to work on August 17, 2006. The application was denied initially and on reconsideration by the Social Security Administration. On August 5, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Arthur F. Schmitt, an impartial vocational expert, appeared on August 18, 2009, considered the case *de novo*, and on March 11, 2010, found that the

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Fed.R.Civ.P. 25(d), Colvin should be substituted for Michael J. Astrue as the defendant in this case.

[2] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

plaintiff was not under a disability as defined in the Social Security Act, as amended.  The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on November 18, 2010.  The plaintiff sought judicial review of the ALJ's decision on January 18, 2011, and the case was remanded by the Honorable J. Michelle Childs, United States District Judge, by order dated March 28, 2012 (Tr. 816-47).

On remand, the ALJ's decision was vacated, and a new hearing was held on June 26, 2012 (Tr. 765-85).  The plaintiff and his attorney, Beatrice Whitten, appeared at the hearing.  Due to a scheduling error, the vocational expert, Robert E. Brabham, Jr., failed to appear at the hearing.  As a result, the ALJ posed hypotheticals to the plaintiff's attorney that were submitted without objection as written interrogatories to the vocational expert (Tr. 782-83, 999-1005, 1009-10).  Pursuant to the district court's remand order, the Appeals Council directed the ALJ to consider all of the claimant's impairments, both severe and non-severe, in combination in determining whether a listing was met or equaled; to explain the reasons for rejecting the opinion of treating physician, Dr. Beale; and to consider the claimant's fibromyalgia as a severe impairment (Tr. 752).  In a new decision dated September 18, 2012, the ALJ determined that the plaintiff was not disabled (Tr. 749-64).  The plaintiff now seeks judicial review of the ALJ's decision.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2011.
>
> 2.  The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 17, 2006, through his date last insured of March 31, 2011 (20 C.F.R. § 404.1571 *et seq.*)
>
> 3.  Through the date last insured, the claimant has the following severe impairments:  degenerative disk disease of the cervical and lumbar spines; history of bilateral calcenaeal fractures with resultant arthritis; degenerative joint disease of the right knee;

2

fibromyalgia; depression; and attention deficit disorder (20 C.F.R. § 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) with the following specific limitations: to lift and carry items weighing 20 pounds frequently and 10 pounds occasionally; to sit for 6 hours in an 8 hour day; to stand and walk for 2 hours in an 8 hour day with allowance to change position from sit to stand for stretching purposes at least every 15 minutes; to push and pull no greater than 20 pounds; never to crawl, kneel, climb, or balance; occasionally to bend and stoop; never to have exposure to temperature extremes, high humidity, vibration, unprotected heights, or dangerous machinery; never to drive; never to perform overhead work; to perform simple, repetitive tasks; and never to work in a fast-paced production environment.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. § 404.1565).

7.  The claimant was born on November 6, 1964, and was 46 years old, which is defined as a younger individual age 18-49, on the date last insured (20 C.F.R. § 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404. Subpart P, Appendix 2).

10.  Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569 and 404.1569(a)).

11. The claimant was not been under a disability, as defined in the Social Security Act, at any time from August 17, 2006, the alleged onset date, through March 31, 2011, the date last insured (20 C.F.R. § 404.1520(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

The plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of

4

establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform, despite the existence of impairments which prevent the return to past relevant work, by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is

5

substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 41 years old on his alleged disability onset date and 46 years old on the date last insured. He has a twelfth grade education and past relevant work experience as a handyman and receiving clerk.

### *Physical Health*

On December 1, 2005, the plaintiff presented to Palmetto Primary Care with tingling in his right hand, upper back, and right shoulder pain (Tr. 575). Cervical spine x-rays dated January 5, 2006, showed upper cervical straightening, which it was thought might have been due to position or spasm (Tr. 295). Mild upper cervical disc narrowing was noted. On January 11, 2006, the plaintiff was seen at Palmetto Primary Care with paresthesias in his right arm and hand (Tr. 573). Exam showed moderate tenderness in cervical spine. He was prescribed Flexeril, Lortab, and Voltaren Sodium (Tr. 574). An MRI of the plaintiff's cervical spine dated January 18, 2006, showed central disc protrusion at the C3-4 and C4-5 levels with indentation upon the spinal cord and mild central canal stenosis (Tr. 464).

The plaintiff saw Dr. Mike Tyler on February 23, 2006 (Tr. 487). The plaintiff reported neck pain and numbness in both hands, greater on the right, lasting the past few months. He reported continuous posterior headaches, neck pain, and pain in the lower cervical spine that radiated to his shoulders. Dr. Tyler reviewed the plaintiff's MRIs. On exam, Dr. Tyler observed range of motion to cause mild to moderate pain with rotation to the left and extension that tended to cause some pain radiating to his right arm (Tr. 488). Tinel's sign and Phalen's test were mildly positive at the right wrist, negative on the left. Dr. Tyler opined that the plaintiff suffered from a combination of congenital cervical stenosis along with acquired cervical stenosis with spur and /or bulging disc. Dr. Tyler opined that

6

the plaintiff's spinal condition might be connected to his headaches.  He recommended steroid injections and prescribed Lortab.

On March 17, 2006, the plaintiff was referred to the Trident Surgery Center for a series of cervical epidural steroid injections (Tr. 300).  He reported posterior neck pain located between his shoulder blades and associated with occasional right shoulder pain, right hand numbness, and occasionally headaches for the past five months.  The plaintiff denied any arm weakness but reported neck pain rating 10/10.  The plaintiff presented for a second epidural steroid injection on March 31, 2006, and reported that his previous injection had given him a dramatic improvement in symptoms but that this only lasted for a few days (Tr. 282).  He reported for his third injection on April 14, 2006, and reported 99.9% relief of his pain (Tr. 270).

The plaintiff was seen by Dr. John Lucas of Charleston Neurology Associates on May 23, 2006, with symptoms suggestive of cervical myelopathy and cervical radiculopathy (Tr. 624).  On June 12, 2006, the plaintiff saw Dr. Lucas again and reported taking as many as five Lortab per day (Tr. 623).  He reported that a series of three epidurals resolved his neck pain entirely for three months before his pain returned.  He was noted to have bilateral moderate carpal tunnels, right greater than left.  He was given wrist braces to wear at night.

On June 22, 2006, the plaintiff told Dr. Tyler that the injections had helped his neck pain but wore off after about a month (Tr. 485).  He reported continuing posterior headaches and numbness in his hands and occasionally in his right foot.  On exam, range of motion was "fairly full," but extension was found to produce pain.  Dr. Tyler opined that the plaintiff might be suffering from compression of the thecal sac at C4-5 (Tr. 486). He described the plaintiff's relief from the injections as "good but temporary."  He planned to start the plaintiff on Lyrica.  An MRI of the plaintiff's cervical spine from June 28, 2006, showed degenerative changes most severe at the C5-6 level (Tr. 465-66).

7

On August 10, 2006, Dr. Tyler reviewed the plaintiff's MRIs and noted a bulging disc with some compression on the spinal cord at C3-4 and C4-5 (Tr. 484). Dr. Tyler felt that the plaintiff would probably need a fusion and discectomy at both levels. He made a recommendation for anterior cervical discectomy and fusion at C4-5 and C3-4.

The plaintiff was seen at Summerville Medical Center on August 17, 2006, following an accident at his place of work (Tr. 459). He reported that he was trying to pry loose something from a diesel truck when he slipped backwards, twisted around, and landed on his feet. He had immediate pain in both heels. He was brought to the emergency room and found to have bilateral calcaneal (heel) fractures. He complained of moderate to severe pain in both heels, worse on the right. He denied any numbness in the lower extremities, knees, or hips. Exam at the time of admission revealed diffuse swelling and bruising around the right ankle and foot and pain on attempting range of motion of the ankle. On the left, swelling over the foot and ankle region but no bruising and no pain on range of motion (Tr. 460). Motion in the hip and knee was normal. X-rays showed displaced calcaneal fractures bilaterally. The plaintiff was treated with splints, bed rest, and elevation of the lower extremities (Tr. 461). He was also placed on a patient-controlled analgesia ("PCA") pump for pain control.

Bilateral foot and ankle x-rays dated August 17, 2006, showed bilateral comminuted, calcaneal fractures were present with displacement of fracture fragments greatest on the right (Tr. 467). There was evidence of a non-displaced right navicular fracture in the right ankle. Lateral ankle soft tissue swelling was observed, greater on the right. A CT scan dated August 18, 2006, confirmed the findings of prior imaging (Tr. 473). The plaintiff underwent surgeries for these fractures on September 7 and 12, 2006 (Tr. 342-43).

A cervical MRI dated October 13, 2006, was largely unchanged from January and June 2006 findings. On October 24, 2006, Dr. Tyler reviewed the plaintiff's October 13

8

scan (Tr. 483, 491). He noted a small ventral disc bulging disc at C3-4 and C4-5 but stated that the plaintiff's condition was largely unchanged since January. He opined that the discs did appear to touch and flatten the spinal cord and should be removed. Dr. Tyler recommended treatment by a chronic pain specialist due to concerns about habituation to narcotic pain medication that the plaintiff had been taking consistently over a long period of time.

On January 9, 2007, Dr. Joel Cox noted that the plaintiff was doing "very well" in respect to his foot injuries (Tr. 333). Exam revealed minimal swelling, and Dr. Cox noted that the plaintiff was progressing well with weight bearing. He recommended that the plaintiff continue with activity and weight bearing to tolerance, continue physical therapy, and restricted activity at work, if available. Dr. Cox opined that the plaintiff would suffer from permanent work-related restrictions and would probably benefit from retraining to a more sedentary occupation. He released the plaintiff to work insofar as he should be allowed to sit down with his feet elevated. Dr. Cox did not feel that the plaintiff was at maximum medical improvement ("MMI").

On January 19, 2007, the plaintiff presented to Lowcountry Orthopaedics and Sports Medicine with bilateral hand numbness, right worse than left (Tr. 332). On exam, he exhibited a positive Tinel's sign and positive compression at the wrist on the right. He was given wrist splints to wear at night. He received injections to both carpal canals, and Dr. Christopher Brooker noted that carpal tunnel release ought to be considered.

On January 29, 2007, the plaintiff underwent an echocardiogram with yielded left ventricular ejection fraction of 78% (Tr. 611).

On February 8, 2007, Dr. Cox reported good progress with respect to the plaintiff's foot injuries (Tr. 331). He continued the restrictions on the plaintiff's activity at work and noted that the plaintiff would probably need retraining to enter a more sedentary

9

occupation.  The plaintiff received a cervical epidural steroid injection on February 28, 2007 (Tr. 390).

On March 26, 2007, Dr. Cox noted some discomfort and swelling over the lateral aspect of the plaintiff's foot and ankle, which he felt might be tendon irritation (Tr. 388-89).  He instructed the plaintiff to continue to use an elastic support and a lace-up ankle support on a regular basis and to continue physical therapy.  He opined that the plaintiff had probably reached MMI.  He released the plaintiff to work with restricted walking, standing, climbing, bending, and stooping.

On March 28, 2007, Jean Smolka, M.D., a State agency physician, determined that the plaintiff had the physical residual functional capacity ("RFC") to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; climb and crawl occasionally; balance, stoop, kneel, and crouch frequently; and perform work not requiring more than frequent gross manipulation with the upper extremities bilaterally, more than occasional overhead reaching in all directions with the right upper extremity, or more than occasional operation of foot controls with the lower extremities bilaterally; and that he had no visual, communicative, environmental, or other manipulative limitations (Tr. 391-98).

On March 29, 2007, Dr. Cox assigned the plaintiff an impairment rating of 36% to the right lower extremity and 36% to the left lower extremity secondary to calcaneal fractures (Tr. 388).  He noted, "The probability is that he will continue to require medical treatment, rehabilitation bracing and probable surgery in the future and will be significantly limited in his level of activity which require him to stand or walk for extended periods of time or distances."

On May 10, 2007, Dr. Tyler noted that the plaintiff was taking approximately four doses of ten milligram Lortab per day for pain in his ankles (Tr 481).  The plaintiff reported pain in his neck, especially when lying down at night, which Dr. Tyler felt was

10

probably muscular.  Dr. Tyler recommended conservative treatment and opined that the plaintiff's symptoms could be related to small disc bulges.  The plaintiff was not a candidate for cervical fusion surgery.  Dr. Tyler referred the plaintiff to Dr. Nolan for evaluation and treatment for chronic pain with possible epidural steroid injections.

The plaintiff was seen at the Trident Pain Center from May 16, 2007, to September 28, 2007 (Tr. 511-547).  At his initial exam on May 16, 2007, the plaintiff was noted to have moderate pain in the entire cervical paraspinous musculature into the bilateral trapezius muscles to the shoulder to palpation, and on range of motion, palpable paraspinous myospasms were present.  He was assessed to suffer from cervical facet arthropathy and myofascial pain and was referred for neuromuscular stimulator and to a wellness program.  His treatment included trigger point injections (Tr. 535) from which he reported moderate relief (Tr. 531).

On June 8, 2007, Dr. Tyler reviewed a May 12, 2007, cervical MRI (Tr. 556) and found no significant change (Tr. 480).  He reiterated that the plaintiff was not a candidate for surgery given his ankle problem and current narcotic pain medication.  He recommended further conservative treatment for neck pain.

On July 16, 2007, Dr. Cox noted continued improvement in regards to the plaintiff's foot and heel pain (Tr. 434).  Celebrex was thought to be helping, but Dr. Cox requested that Dr. Nolan put the plaintiff on a trial of medications to replace his Lortab.  Dr. Cox stated, "He is in the process of considering Voc Rehab cross training for a more sedentary new occupation and overall it sounds like he is making good progress along those lines.  I would have him otherwise be on activity within the limits of tolerance . . . .  I would leave it up to him about returning for further f/u evaluation and treatment for his foot and ankle problem" (Tr. 434).

X-rays of lumbar spine dated August 14, 2007, showed severe lumbar spondylosis, probable spinal stenosis, mild retrolisthesis at L2-3 and L3-4, and mild anterolisthesis at L4-5 (Tr. 626).

An August 24, 2007, MRI of the lumbar spine showed multilevel degenerative disc disease greatest at L2-L3 level where there was a broad right paracentral disc protrusion resulting in mild central canal stenosis (Tr. 559). Left neural foraminal narrowing and mass effect upon the exiting left L4 nerve root were observed at the L4-5 level. Small disc protrusion eccentric to the left at the L5-S1 level with mild left neural foraminal narrowing was also noted.

On September 11, 2007, Dr. Tyler noted degenerative changes at L2-3, but an overall improvement in the plaintiff's neck pain after several injections (Tr. 480).

An October 9, 2007, exam at Palmetto Primary Care showed positive straight leg raises and radicular pain (Tr. 609).

On October 26, 2007, the plaintiff saw Dr. Shailesh Patel for an initial evaluation and consultation for treatment options in regards to pain complaints (Tr. 650-53). The plaintiff reported that his worst pain was in his heels, which was 8/10 most days and described as deep pressure and an aching sensation. The plaintiff reported neck and back pain that radiated to his legs causing sharp, burning pains. On exam, Dr. Patel noted decreased sensation to light touch in the bilateral L4, L5, and S1 distributions in both lower extremities. Waddell signs were negative. Dr. Patel's assessment included chronic bilateral heel pain secondary to history of calcaneal fractures, chronic low back pain, chronic neck pain, chronic neck pain, cervical degenerative disc disease, lumbar degenerative disc disease, and lumbar and cervical mysofascial pain syndrome. He noted that the plaintiff reported relief with Lortab but no lasting benefit from epidural steroid injections. He suggested a plan to combine a long-acting pain medication with short term

12

medications to be used for breakthrough pain. The plaintiff signed a pain contract and was prescribed Lortab and Ultram.

Dr. Patel's assessment and examination findings were largely the same on November 21, 2007 (Tr. 698-99). He noted that the plaintiff had not responded to Ultram and recommended MS Contin, 15mg. On December 13, 2007, Dr. Patel noted that the plaintiff was unable to tolerate MS Contin secondary to increased sedation (Tr. 697). Exam and impression were unchanged. Dr. Patel prescribed Methadone (Tr. 695).

On December 5, 2007, William Cain, M.D., a State agency physician, determined that the plaintiff retained the physical RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk and sit about six hours in an eight-hour workday; push/pull within his lifting capacity; climb ramps/stairs, balance, stoop, kneel, crouch, and crawl occasionally; and perform work not requiring climbing ladders/ropes/scaffolds or more than frequent fingering bilaterally; and that he had no visual, communicative, environmental, or other manipulative limitations (Tr. 654-61).

On January 9, 2008, the plaintiff reported to Dr. Patel that Methadone had initially helped, but felt his pain was returning (Tr. 695). Dr. Patel increased his Methadone prescription and added Lyrica. On March 6, 2008, the plaintiff reported that his medications wore off at the end of the day (Tr. 691). Exam was unchanged except lower extremity testing was positive for facet loading bilaterally (Tr. 690). Assessment and medications were unchanged except that Dr. Patel recommended a trial of medial branch blocks for the facet syndrome (Tr. 689). Dr. Patel continued to monitor the plaintiff's medications throughout 2008 (Tr. 685-689). On April 3, 2008, Dr. Pate "encouraged him to f/u with Voc Rehab to determine what kind of work he may be most suitable for as the pt has been denied disability x 2" (Tr. 687).

On February 9, 2009, Dr. Gregory Niemer of Lowcountry Rheumatology examined the plaintiff and found multiple trigger points consistent with fibromyalgia (Tr. 735).

In April and July of 2009, and in August 2010, the plaintiff was seen by Dr. Francis Tunney for hypertension (Tr. 1030-36). Dr. Tunney also noted problems with gastroesophageal reflux disease ("GERD"), ankle swelling, and chronic medication use (Tr. 1030-36). He did not impose any functional limitations.

On May 19, 2010, the plaintiff saw Dr. Cox for complaints of heel pain. On exam, Dr. Cox noted mild swelling without redness or increased local temperature. Gentle ROM was not particularly painful or limited. Subtalar motion was slightly limited with only mild stress but no significant increased pain. Most of the plaintiff's pain came from direct vertical weight bearing. X-rays revealed post traumatic arthritic changes at the subtalar joint with partial collapse of the subtalar joint. Dr. Cox's impression was progressive post traumatic arthritis, subtalar joints, bilaterally. He prescribed him Celebrex to try to give the plaintiff some partial improvement and relief. Dr. Cox asked the plaintiff to consider removal of the hardware from his heels and opined that the plaintiff "is to be on activity within the limits of tolerance" (Tr. 1122).

In a letter dated June 21, 2010, Dr. Niemer wrote that he treated the plaintiff for chronic fibromyalgia (Tr. 1017). He noted that the plaintiff's fibromyalgia was aggravated by the fact that he was unable to exercise secondary to back and foot pain and had chronic poor quality sleep secondary to neck and back pain. Dr. Niemer wrote that the plaintiff had diffuse myalgias on a daily basis and severe fatigue. Dr. Niemer noted that although the plaintiff's primary illnesses were degenerative disc disease and chronic foot pain secondary to trauma, the fibromyalgia worsened the severity of his daily pain and greatly affected his daily activities.

14

On November 11, 2010, Dr. Patel noted that the plaintiff was not able to walk on his heels or toes due to "severe pain" (Tr. 1119).  Dr. Patel subsequently amended his earlier notes, from October 26, 2007, through February 7, 2008, to reflect that the plaintiff was unable to walk on his heels or toes due to "severe pain" (Tr. 1117).  Dr. Patel did not impose any persistent functional limitations pertaining to the relevant period.  After the relevant period, on November 28, 2011, Dr. Patel noted the plaintiff's complaint of knee pain, for which the plaintiff ultimately received an injection on December 5, 2011 (Tr. 1115-16, 1113-14).

On February 22, 2011, David Robinson, M.D., saw the plaintiff for a consultative orthopedic evaluation on behalf of the State agency (Tr. 1076-85).  Dr. Robinson summarized the plaintiff's medical history and noted his allegation of disability due to heel problems and arthritis (Tr. 1076-78).  As to the plaintiff's daily activities, Dr. Robinson noted that plaintiff had "[n]o significant limitations in use of bathroom, showering, dressing, preparing simple meals, and performing light chores" (Tr. 1082).  After a physical examination (Tr. 1079-81), Dr. Robinson opined that prolonged sitting increased the plaintiff's discomfort, that he had limitations in standing/walking due to issues with his heels, back, and knees, that he could probably perform "light and infrequent lifting and carrying," and that he "should be able to perform gross and fine manipulation with both hands" (Tr. 1082).  However, the plaintiff was "not a good candidate for overhead reaching or climbing," "not a good candidate for driving and traveling," and seemed to be able "to understand, remember, and carry out basic instructions" (Tr. 1082).

State agency physician Cleve Hutson, M.D., reviewed the evidence on March 1, 2011 (Tr. 1093).  Dr. Hutson opined that the plaintiff could perform activities consistent with light work (Tr. 1087-88) with no climbing of ladder/rope/scaffolds, only occasional climbing of ramp/stairs, only occasional balancing/stooping/kneeling/crouching/crawling (Tr.

1088), only occasional reaching in all directions (Tr. 1089), and the avoidance of moderate exposure to hazards (Tr.1090).

On July 6, 2011, State agency physician Jim Liao, M.D., reported that the plaintiff "was a no show" for an x-ray (Tr. 1111).  He opined, "I do not see where he would meet [or] equal [a Listing] or be a med[ical] voc[ational] allowance w[ith] the mer [medical evidence] that we have" (Tr. 1112).

### Mental Health

The plaintiff saw Dr. Mark Beale of Charleston Psychiatric Associates on April 20, 2007 (Tr. 567).  Dr. Beale's assessment included major depressive disorder, attention deficit disorder, and social phobia/panic (Tr. 567).  The plaintiff's mood and affect were normal, but he reported irritability when in pain.  He was prescribed Adderal, Ambien, and Effexor.  On May 18, 2007, his mood had improved, and he was noted to feel "pretty good."

On July 13, 2007, Dr. Beale noted that the plaintiff's affect was anxious and that his mood was low and irritable (Tr. 566).  He reported anxiety, sadness, hyper vigilance, and crying spells.  He was compliant with medications but felt that his Effexor had stopped working.  On July 11, 2008, Dr. Beale maintained his diagnoses from before and started the plaintiff on Trazadone (Tr. 730).  On February 18, 2009, he wrote:

> I am [the plaintiff's] treating psychiatrist and have seen him for medication management visits in my office since November 2003.  He is treated for major depression and panic disorder. These were significantly worsened after a work-related injury which led to chronic pain in August 2006.  He is unable to work due to pain and depression and side effects of medications which he will need chronically.

(Tr. 728). On May 7, 2009, Dr. Beale noted that the plaintiff's pain was increased, and the plaintiff reported that his depression was recurring (Tr. 724).  On June 15, 2009, Dr. Beale noted that the plaintiff was isolating himself and suffered from worsening mood (Tr. 722). Diagnoses were as before.

On July 2, 2009, the plaintiff told Dr. Beale that Geodon caused him to feel "blah" and he had self discontinued (Tr. 1046). Dr. Beale noted that he was irritable and isolating. His mood was worsening, and he was unable to participate in family or work secondary to pain and depression.  The plaintiff saw Dr. Beale in follow-up on February 19 and April 2, 2010. At the April 2 visit, Dr. Beale noted that his mood was low and that he was down (Tr. 1049).  The plaintiff returned on May 9, 2010, and reported that, despite family stressors, the medications were helping some (Tr. 1050). On June 4, 2010, Dr. Beale noted that the plaintiff was distractible and fidgety (Tr. 1051). On July 6, 2010, Dr. Beale noted that the plaintiff was unable to work secondary to pain, depression, and anxiety (Tr. 1052). While he noted that the plaintiff did not want to comply with treatment, he also pointed out that he saw no signs of malingering. Dr. Beale continued to monitor the plaintiff's psychiatric condition in the fall of 2010 (Tr. 1053-54). Adderall was uneffective, so Dr. Beale placed the plaintiff on Vyvanse.  At a routine visit on January 18, 2011, Dr. Beale noted that the plaintiff's mood was stable with dysthymia (Tr. 1096).  The plaintiff was shifting in his seat and walking with a limp. He felt Vyvanse was helpful, and Dr. Beale continued his prescription.

On May 7, 2007, Jeffrey Vidic, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, maintain socially appropriate behavior and adhere to basic standards of

17

neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that he had moderate limitations in his abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes (Tr. 415-32).

Dr. Vidic concluded that the plaintiff had the mental RFC to follow rules and remember simple one or two-step instructions; attend to simple tasks for two hours at a time 40 hours weekly without significant interference from psychiatric symptoms; make simple, work-related decisions and respond to minor changes in work routine with minimal supervision; perform work in the presence of others not requiring working with the public or coordinating closely with others; accept supervision and feedback regarding job performance; make simple plans; set simple goals; avoid common workplace hazards; use public transportation; and maintain appropriate appearance and hygiene (Tr. 415-32).

On February 1, 2008, Cashton B. Spivey, Ph.D., a consultative licensed clinical psychologist, examined the plaintiff. The plaintiff reported experiencing depression and headaches and currently taking pain, anticonvulsant, antidepressant, sedative, and other medications, but denied experiencing memory deficits and anxiety. He also reported a history of twice being arrested for "driving under the influence" and current daily alcohol consumption. He further reported cooking, performing general cleaning, reading, watching sports, driving an automobile, and transporting his children to school, and being capable of caring for his personal needs independently and performing simple arithmetic calculations (Tr. 662-65).

Examination revealed that the plaintiff was oriented, appropriately dressed and groomed, and cooperative with testing, and demonstrated normal mental functioning and absence of significant cognitive impairment, including intact language skills, satisfactory fund of information, estimated average to low average intellectual functioning, and the abilities to perform serial 7s, recall two of three objects after five minutes, and follow a three-step command.  Dr. Spivey diagnosed anxiety and depressive disorders, economic problems, and physical diagnoses and resultant symptoms (by report) (Tr. 662-65).

On February 22, 2008, Judith Von, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple or detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that he had moderate limitations in his abilities to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods and interact appropriately with the general public.  Dr. Von concluded that the plaintiff had no cognitive limitations and had the mental RFC to attend work on a regular basis, sustain a typical work routine, and interact appropriately with others  (Tr. 666-83).

19

On June 5, 2008, Cal VanderPlate, Ph.D., a State agency psychologist, determined that the plaintiff had no significant limitations in his abilities to remember locations and work-like procedures, understand, remember, and carry out short and simple instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, sustain an ordinary routine without special supervision, work in coordination with or proximity to others without being distracted by them, make simple work-related decisions, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness, respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others; and that he had moderate limitations in his abilities to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods, and interact appropriately with the general public.  Dr. VanderPlate concluded that the plaintiff had the mental RFC to understand and remember simple directions, carry out simple tasks, maintain attention and concentration for at least a two-hour period during an eight-hour day, complete a normal workweek, relate to supervisors and coworkers, deal appropriately with criticism, manage stress, adjust to a task setting, and deal with normal changes (Tr. 703-20).

Psychologist Francis Fishburne, Ph.D., evaluated the plaintiff on December 27, 2010 (Tr. 1056-60).  Dr. Fishburne noted that the plaintiff lived with his wife and two children, saw a psychiatrist every one or two months, and never had a psychiatric

hospitalization (Tr. 1056).  As to his daily activities, the plaintiff reported that he helped his kids to school, lay in bed, did some household chores (laundry, vacuum, dust, some grocery shopping), and cooked a full meal once a month (Tr. 1057).  Dr. Fishburne diagnosed depression and alcohol abuse (Tr. 1059).  As to the plaintiff's functioning, Dr. Fishburne opined that his concentration and memory were good, was able to understand and follow simple instructions without difficulty (Tr. 1057), and should be able to work an eight-hour day (Tr. 1059).

On January 4, 2011, based on her review of the evidence (*see* Tr. 1073), State agency psychologist Kathleen Broughan, Ph.D., opined that the plaintiff did not have any severe mental impairment (Tr. 1061).  She generally agreed with Dr. Fishburne's opinion and stated that the plaintiff's mental impairments "impose[d] minimal limitations on his ability to perform basic work-related tasks and functions" (Tr. 1073).

On July 6, 2011, State agency psychologist Lisa Varner, Ph.D., opined that there was insufficient evidence to assess the plaintiff's mental impairments (Tr. 1097).  Dr. Varner noted that the plaintiff had missed a scheduled physical examination and did not return a report (Tr. 1109).  Thus, Dr. Varner stated that there was insufficient evidence "due to failure to cooperate" (Tr. 1109).

### *Administrative Hearings*

At his hearing on August 18, 2009, the plaintiff testified that he sustained work-related injuries in August 2006 for which he received a workers' compensation award. He also testified that he experienced neck and back pain and bilateral foot pain and numbness for which he took medication that was effective without side effects.  He further testified that he "got depressed."  He additionally testified that he rated his pain as at times a 10 plus on a scale of one to 10.  The plaintiff stated that he attended his children with difficulty, performed household chores with difficulty, and drove an automobile.  He also stated that he could lift 30 to 40 pounds, sit two hours at a time, stand one to three hours

21

at a time, walk 45 minutes to one hour, read, write, add, and subtract, get along and work with others, understand and follow instructions, and keep his mind on what he was doing if he was not hurting (Tr. 35-45).

At the June 26, 2012, hearing (Tr. 765-85), the plaintiff testified that he was disabled by pain in his feet, back, and neck (Tr. 771-72). He described his pain as constant and his foot pain as a constant "10" on a scale of 1 to 10 (Tr. 774, 777). He stated that he was taking medications for his pain prescribed by Dr. Patel, whom he saw "every couple of months." He was also being treated by Dr. Beale, who also prescribed medications (Tr. 772). The plaintiff said that he experienced sleepiness as a side effect of his medications (Tr. 773) for about an hour after taking them (Tr. 779). He stated that he spent 85 to 90 percent of his time lying down (Tr. 781). As to his functional limitations, he stated that he could sit for an hour, stand for an hour, and lift up to 20 pounds. He had no problems using his hands (Tr. 774). He got along with people "fine" and had a "pretty good" memory (Tr. 775). He used to have panic attacks, until he started taking medications for it (Tr. 775). He said that he was able to take care of his personal needs (Tr. 775).

Since vocational expert witness Robert Brabham did not appear at the hearing as scheduled, the ALJ proposed to issue written interrogatories to him (Tr. 782; *see* Tr. 768-69). The ALJ summarized the interrogatories, and the plaintiff did not object to the ALJ's proposal (Tr. 782-83). The vocational expert responded to the ALJ's written interrogatories on August 14, 2012 (Tr. 999-1005). The vocational expert stated that, based upon the hypothetical presented by the ALJ, the individual described could perform the occupations of machine tender, surveillance monitor, and addresser (Tr. 1001).

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly consider the combined effect of his multiple impairments; (2) failing to make a proper credibility analysis

22

based on the applicable legal framework and supported by substantial evidence; and (3) failing to properly explain the weight given to treating physicians' opinions.

### Combined Effect of Impairments

The plaintiff first argues that the ALJ failed to properly consider the combined effect of his multiple impairments at step three of the sequential evaluation process. *See* 20 C.F.R. § 404.1526(b)(3) ("If the findings related to your impairments are at least of equal medical significance to those of a listed impairment, we will find that your combination of impairments is medically equivalent to that listing."). When, as here, a claimant has more than one impairment, the ALJ must consider the severe and nonsevere impairments in combination in determining the plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). It "is axiomatic that disability may result from a number of impairments which, taken separately, might not be disabling, but whose total effect, taken together, is to render claimant unable to engage in substantial gainful activity.... [T]he [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them." *Id.* (citing *Reichenbach v. Heckler*, 808 F.2d 309 (4th Cir.1985)). The ALJ's duty to consider the combined effect of the plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability determination process." 20 C.F.R. § 404.1523.

At step two of the sequential evaluation process, the ALJ found the plaintiff had the following severe impairments: degenerative disk disease of the cervical and lumbar spines, history of bilateral calcaneal fractures with resultant arthritis, degenerative joint disease of the right knee, fibromyalgia, depression, and attention deficit disorder (Tr. 755). The ALJ also identified the plaintiff's history of gastroesophageal reflux disease ("GERD"), hypertension, history of carpal tunnel syndrome, and history of panic attacks as non-severe (Tr. 755). These non-severe impairments had no combined effects with the remaining

23

impairments. As the ALJ explained, the plaintiff's GERD, hypertension, and history of panic attacks were controlled with medications (Tr. 755), and, notwithstanding, there was no medical evidence of associated persistent functional limitations. As to the plaintiff's carpal tunnel syndrome, the ALJ noted that this had been treated conservatively and that the plaintiff himself had testified that he had no problems using his hands (Tr. 755; *see* Tr. 774).

At step three, the ALJ specifically considered Listings 1.02, 1.04, 1.06, 12.04, 12.06, and 12.10 and found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled these Listings (Tr. 755-58). Contrary to the plaintiff's argument, the ALJ expressly "considered the combined effects of the claimant's impairments, both severe and non-severe," in assessing whether the plaintiff was presumptively disabled under the Listings (Tr. 758). The ALJ found as follows:

> Finally, the undersigned has considered the combined effects of the claimant's impairments, both severe and non-severe, set forth above, and has determined that through the date last insured, the findings related to them are not at least equal in severity to those described in Listings 1.00, 2.00, 4.00, 5.00, 6.00, 11.00, 14.0, et seqs. See also Walker v. Bowen, 889 F.2d 47 (4th Cir. 1989). Specifically, the undersigned notes that the claimant's orthopedic and musculoskeletal impairments resulted in some lifting limitations; however, he remained highly functional, living independently without the need of assistance. He required use of medications, which reduced his symptoms and did not lead to inpatient hospitalizations. He had, diffuse myalgias with some sleeping difficulties with negative blood work for rheumatoid arthritis. (Exhibit 27F). In addition, as noted above, he had mild to moderate mental limitations that failed to reach Listing level or prevent him from performing activities of daily living. He also did not have damage to other parts of his body or end-organ damage as a result of his impairments. Finally, he did not require hospitalizations or chronic care for his condition. As a result, the undersigned finds that through the date last insured, the combined effects of the claimant;'s impairments, both severe and non-severe, set forth above, and has determined that through the date last insured, the findings related to them are not at least equal in severity to those described in Listings 1.00, 2.00, 4.00, 5.00, 6.00, 11.00, 14.0, et seqs

24

(Tr. 758).

Moreover, as argued by the Commissioner, even if the ALJ had somehow erred by not articulating this analysis of the combined effects of the plaintiff's impairments, it would be harmless error.  The plaintiff does not argue that he was disabled under any particular Listing, even though it was his burden to do so. Absent the identification of a particular Listing and a theory of disability thereupon, it is impossible for the plaintiff to show how the alleged error would have been harmful. Thus, even if the ALJ had somehow erred in this regard, the plaintiff has not established any harm resulting from such error, and his argument must fail. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

***Credibility***

The plaintiff next argues that the ALJ's credibility analysis was flawed as it was not based on the applicable legal framework nor supported by substantial evidence (pl. brief at pp. 23-26).  The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process.  First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996).  In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause

25

the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565.  However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p, 1990 WL 300812).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id.* at 565 n.3 (quoting *Craig*, 76 F.3d at 595). *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005); 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled.  However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. § 404.1529(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1)     the individual's daily activities;

(2)     the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     factors that precipitate and aggravate the symptoms;

(4)     the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7)     any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3. *See* 20 C.F.R. § 404.1529(c).

27

The ALJ found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent they were inconsistent with the RFC assessment (Tr. 759). The ALJ recounted the medical opinions as to the plaintiff's functional limitations (Tr. 760-61), which were a valid credibility consideration. 20 C.F.R. § 404.1529(c)(1) ("We also consider the medical opinions of your treating source and other medical opinions as explained in § 404.1527"). As argued by the Commissioner, none of these opinions supported the plaintiff's claims that he could not sit or stand for more than one hour each and that he needed to lie down 85 to 90 percent of the time (approximately 21 hours each day) (Tr. 774, 781). The ALJ also noted the plaintiff's reported daily activities, including performing household chores (Tr. 759-60). While the plaintiff argues that his ability to perform some daily activities did not translate to an ability to work (pl. brief at p. 26), it is a valid consideration in the ALJ's credibility analysis. *See* 20 C.F.R. § 404.1529(c)(3) ("Factors relevant to your symptoms, such as pain, which we will consider include: (i) Your daily activities"). The ALJ noted that the plaintiff had told Dr. Robinson in 2011 that he had no significant limits in using the bathroom and shower, dressing, preparing simple meals, and doing light chores (Tr. 760; *see* Tr. 1082). The ALJ also acknowledged the plaintiff's own statements about his panic attacks being controlled with medication, his ability to use his hands, his ability to lift 20 pounds, and his ability to get along with people (Tr. 759; *see* Tr. 774-75). This, too, was a valid credibility consideration. 20 C.F.R. § 404.1529(c)(3) ("We will consider all of the evidence presented, including . . . your statements about your symptoms").

Moreover, as argued by the Commissioner, the ALJ did not find that the plaintiff was free of pain. Rather, the ALJ found that the plaintiff was extremely limited, such that he could not do a full range of light work. However, the vocational expert testified that

even with an RFC restricted to a limited range of light work, there still existed a significant number of jobs in the national economy that the plaintiff remained capable of performing. Based upon the foregoing, this allegation of error is without merit as substantial evidence supports the ALJ's credibility finding.

### Opinion Evidence

Lastly, the plaintiff argues that the ALJ failed to explain the weight given to the treating physicians' opinions in this case. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 404.1527(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the examining relationship; (2) the length of the treatment relationship and the frequency of the examinations; (3) the nature and extent of the treatment relationship; (4) the evidence with which the physician supports his opinion; (5) the consistency of the opinion; and (6) whether the physician is a specialist in the area in which he is rendering an opinion. *Id.* § 404.1527(c)(1)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 404.1527(c)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in SSR 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the

> opinion is not entitled to "controlling weight," not that the opinion should be rejected.  Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927].  In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

The plaintiff argues that the ALJ did not adequately explain his reasons for rejecting Dr. Beale's testimony regarding his "chronic need for medication and the side effects thereof" and Dr. Niemer's opinion that his pain was "complicated by the combination of his fibromyalgia and orthopedic impairments" (pl. brief at pp. 26-27).  Dr. Beale opined, *inter alia*, that the plaintiff was "unable to work due to pain and depression and side effects of medications which he will need chronically" (Tr. 728). However, Dr. Beale did not identify any specific side effect from the plaintiff's medications, and he did not explain how the plaintiff's chronic need for medications resulted in any persistent, work-related functional limitations.  As the ALJ noted (Tr. 758), the plaintiff's medications successfully controlled his mental health problems, so his chronic use of such medications apparently was beneficial.  The ALJ also noted that Dr. Beale's findings were inconsistent with the plaintiff's own statements of his activities of daily living, including his ability to engage in substantial mental activities for sustained periods (Tr. 761).  Moreover, the ALJ noted that the plaintiff suffered from "some concentration difficulties, due primarily from the side effects of his medications," and the ALJ accommodated those difficulties "with the specific limitation of needing to perform simple, repetitive tasks and never to work in a fast-paced production environment" (Tr. 761).  Based upon the foregoing, the ALJ's assessment giving Dr. Beale's opinion "very limited weight" is based upon substantial evidence and is without error.

Dr. Niemer stated that the plaintiff had chronic fibromyalgia and pain resulting from that diagnosis as well as from degenerative disc disease and heel problems (Tr. 1017).  Dr. Niemer noted that although the plaintiff's primary illnesses were degenerative

disc disease and chronic foot pain secondary to trauma, the fibromyalgia worsened the severity of his daily pain and greatly affected his daily activities. The ALJ gave the opinion "little weight," noting that the opinion was "without definition regarding functional capacity" (Tr. 761). The ALJ further noted that the opinion was contrary to the plaintiff's reports to Dr. Robinson that he could perform basic activities of daily living without significant difficulties (*id.*). As noted by the Commissioner, the fact of the plaintiff's pain is undisputed; the issue was the limiting effects of the plaintiff's pain and other symptoms. Here, the ALJ gave specific reasons for giving little weight to Dr. Niemer's opinion, which set forth no functional limitations. Based upon the foregoing, this allegation of error is without merit.

The undersigned further finds that the ALJ's RFC assessment was based upon substantial evidence, including the plaintiff's testimony that he could lift 20 pounds and had no difficulty using his hands; examination findings by Drs. Patel and Spearman showing the plaintiff had 5/5 motor strength in his upper and lower extremities with slightly decreased sensation and good range of motion in his left hip and ankle; Dr. Robinson's orthopedic examination findings; Dr. Patel's finding that the plaintiff was not able to walk on his heels and toes; and Dr. Spivey's mental examination findings.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

March 11, 2014
Greenville, South Carolina

31